Bolton *v.* Dickens.

4L 569
11L 217

SARAH W. BOLTON, Ex'tx, *v.* THOMAS DICKENS, et al.

1. PARTNERSHIP. *Statute of limitation.* The statute of three years presents no barrier in a Court of Chancery to an account between deceased partners.

2. SAME. *Lapse of time.* There is no period of time definitely fixed as an absolute bar. The reasons for refusing relief, because of lapse of time, are, in part, that the loss of papers, death of parties and witnesses, and the failure of memory, involve the transactions in so much obscurity and uncertainty that any attempted settlement will probably fall far short of reaching the truth, and may do injustice.

Cases cited: *Godden* v. *Kimmel*, 9 Otto, 201; *Marsh* v. *Whitmore*, 21 Wall., 185; *McEwen* v. *Gillespie.*

FROM SHELBY.

Appeal from the Chancery Court at Memphis. R. J. MORGAN, Ch.

L. W. FINLAY for Complainant.

GANTT & PATTERSON, D. E. MYERS, W. M. RANDOLPH and ESTES & ELLETT for Defendants.

DEADERICK, C. J., delivered the opinion of the Court.

On the 10th of June, 1868, complainant filed her bill in the First Chancery Court of Shelby County against Thomas Dickens, Wade H. Bolton, the administrator with the will annexed of Isaac

L. Bolton, and against the heirs at law of said Isaac L., and the heirs at law of complainant's testator, and the heirs at law of Mary Bolton, the mother of said Wade H. and Isaac L.

The principal object of this bill was to have an account and settlement of a partnership between complainant's testator, Washington Bolton, and defandants, Thomas Dickens, Wade H. Bolton and Isaac L. Bolton, deceased, in the purchase and sale of negroes and cotton, which expired on the 1st day of June, 1857.

The heirs of Mary Bolton, deceased, the mother of defendants, Wade H. and Isaac L., were made parties in order that the title to certain real estate in Memphis might be divested out of them, and accounted for as partnership property, upon the allegation that the title had been vested in her by fraud by said Wade H. and Isaac L., in order to defeat the rights of the other partners.

The defendants, except Dickens and testator's heirs, demurred to the bill upon several grounds. Amongst other causes of demurrer, the statutes of limitations of three and six years were relied upon, as well as the lapse of time.

The demurrer was overruled, and the principal defendants answered. Many depositions were taken, and much documentary evidence was filed in the cause, and on the hearing, the Chancellor held that the complainant was not entitled to an account, and dismissed her bill, from which decree she has appealed to this Court.

Bolton v. Dickens.

In 1847, Dickens, Wade H. and Isaac L. were partners in negro trading. In 1850 an extension of the terms of partnership to the 1st of June, 1855, was agreed upon, and Washington Bolton then became a partner, although he did not sign the article of copartnership, which had been signed by the others.

At the end of this term, a further extension of the term was agreed to in writing, carrying it up to June 1st, 1857. The last two articles provided for the purchase and sale of cotton as well as negroes.

There is no direct proof that we have discovered as to the residence of the several partners when the first partnership was entered into. But we infer from the record that they all resided in Shelby county, and continued to reside there for many years afterwards. And it is recited in the articles of 1847, 1850 and 1855, that the parties thereto resided in Shelby county.

Dickens, however, as he got more largely engaged in business, purchased in Richmond, Va., and Washington Bolton in Lexington, Ky., while Wade H. remained in Memphis, buying cotton and selling slaves, and Isaac L., to whom most of the slaves bought by Dickens and Washington Bolton were sent, received them at Vicksburg, Miss., and sold them. He was the principal salesman, and employed agents to convey the negroes to other points and sell them. The purchasers, likewise, employed agents to travel and purchase and con-

vey their purchases to Wade H. or Isaac L. They had thus in their service, from time to time, a large number of agents, to whom, it incidentally appears, very considerable sums of money were paid. But there is not even an attempt to show its aggregate amount, or by whom paid, although each member was to keep such account.

Each of the purchasers was required to take bills of sale and file them with the book-keeper, Wade H. Bolton, and to show all items of expense incurred. This last provision applied also to the salesmen.

These requirements, it is stated in Wade Bolton's answer, were not complied with by complainant's testator, nor by Dickens, but he states as far as he had material he had made out balance sheets, which showed Washington Bolton and Dickens, after the termination of the partnership, largely indebted to the firm.

On the 22nd of May, 1857, about eight days before the expiration of the partnership, Isaac L. Bolton killed a man named McMillan in Memphis, and he and Wade, who was charged as an accessory to the homicide, were arrested and imprisoned. Wade was released on bond in a few days, but Isaac L. remained in prison until he was tried and acquitted, about a year thereafter.

At this time it appears that Dickens was at his farm in Missouri, and Washington Bolton at Lexington, Ky.

After the trial, it is alleged in the bill, that Wade refused to settle unless the partners would all agree to share equally in the expenses incident to the trial, amounting to the large sum of $80,000, or, as estimated by others, $100,000. This large sum, it is intimated, was used, not only for legitimate purposes in defense of the accused, but was largely employed to bribe witnesses and jurors.

There was a stipulation in the partnership articles, that all the partners should bear equally the expenses of any litigation growing out of their business transactions, where any one member was sued; and Wade Bolton insisted, and insists in his answer, that as the difficulty resulting in the killing of McMillan grew out of the purchase of a negro from McMillan, who was a slave only for a term of years, and was sold as a slave for life, that the case fell within the provisions of the articles, and that all the partners so considered it, and all agreed to share the expense. But he denies that he refused to settle until this was done. And he adds, that the most of the expense incident to the killing of McMillan was paid by himself and I. L. Bolton, and that he had paid all the debts of the ffrm, amounting to more than $100,000.

A short time before the dissolution of the firm, Dickens had gone to Missouri, where he had a farm, with a considerable number of negroes upon it. Washington Bolton was in Kentucky, and I. L. Bolton had removed to his farm in Arkansas, where,

we infer, he remained after his release from prison until his death, in 1864.

Washington had entered into partnership with one White, in negro trading, and, from being poor when he became a partner with Boltons and Dickens, he amassed considerable property, and had money. All the partners, in fact, appear to have retired and gone into other occupations, without making a settlement of their partnership.

Washington Bolton died in 1862, and in 1866 Wade Bolton's house was burned, and all his vonchers, as he alleged, and nearly all the books of the concern were destroyed.

In 1867, Wade Bolton and Dickens, the surviving partners of the late firm of Bolton, Dickens & Co., who had become very hostile to each other, had some correspondence, and made some attempts or appointments to meet for a settlement. But before anything was done, this bill was filed, and not long after Wade Bolton answered he was killed, and shortly thereafter Dickens was killed. Thus, before much evidence was taken in this cause, the last one of the four partners was dead.

The complainant knew but little of the business of the firm, as is manifest from the general and indefinite character of the charges in her bill.

What purports to be Washington Bolton's account of negroes bought and expenses at Lexington, is found in a book filed in this case. This contains a long list of negroes, bought by him

and his agents. Against the names of the negroes are, in some instances, brief memoranda of the time of shipment, and to what point. In other cases simply the word "shipped." In other cases, (the cost in all cases being given), are found the word "sold," and the price, showing the profit, but not showing to who or by whom sold, the date of sale, nor what was done with the proceeds of sale. Besides, this book furnishes intrinsic evidence of being an incomplete statement of the business done by him.

The same may be said of I. L. Bolton's book. It contains mere memoranda, often very briefly and unintelligibly entered, and if both books were accepted as correct, it would be impracticable to obtain from them satisfactory data for a settlement of their accounts. Nor is there any more satisfactory data as to the accounts of Dickens and Wade Bolton with the firm.

The cotton transactions are scarcely less difficult to understand than those in the purchase and sale of negroes.

One of the commission merchants in New Orleans files a large number of drafts drawn upon his house by the firm. All the members were authorized to draw, and most of them did occasionally. Although it is manifest that the greater part of the funds in the hands of commission merchants in New Orleans, arising from the sale of cotton or discount of bills or drafts drawn by purchasers of negroes, was drawn for and for-

warded to Dickens and Washington Bolton, by Wade Bolton, yet it is impossible to ascertain who were the drawers, and who received the proceeds in every instance.

Another commission merchant, who did business with the firm to the extent of more than a million of dollars, says the drafts paid, drawn by Bolton, Dickens & Co., and their letters, have been destroyed, and they cannot tell by what member of the firm they were severally drawn, except six drawn by Washington Bolton, and that it is impossible to state the account with said firm so as to show the rights and liabilities of said firm, as between themselves. That large amounts were drawn from Lexington, Ky., (Washington Bolton's place of business), and from Richmond, Va., (where Dickens was located), but we cannot tell from his books the amount drawn from either place, nor by whom. He adds that he thinks the firm made no money in their cotton transactions in 1856 and 1857.

If the accounts had been so kept as to present with certainty their true state between the parties, lapse of time might not present any insuperable objection to the jurisdiction of the Chancery Court.

We do not think that the statute of three years, pleaded in this case, presents any barrier in a Court of Chancery to an account between partners.

This Court said, Judge McFarland delivering

the opinion, at its last term at Knoxville, in the case of *McEwen* v. *Gillespie* et al., that "there is no period of time definitely fixed as an absolute bar," etc., and adds: "the reasons upon which Courts refuse relief because of the lapse of time are, in part, that the loss of papers, death of parties and witnesses, and the failure of memory, involve the transactions in so much obscurity and uncertainty that any attempted settlement will fall far short of reaching the truth, and may do injustice." To the same effect are the cases of *Godden* v. *Kimmel*, 9 Otto, 201, and *Marsh* v. *Whitmore*, 21 Wall, 185.

In this case we have the loss of papers, which are very imperfectly supplied, to a limited extent, by the frail memory of witnesses, in some cases, perhaps, with strong prejudices or partialities, the lapse of time and the death of all the partners.

Besides, the parties, or any one of them, might have instituted proceedings while all were alive. Instead of that being done, each one, seemingly satisfied with his share of the whole, which the end of the partnership—1st of June, 1857—left in his possession, retired or engaged in other occupations, and no step was taken until about eleven years after the expiration of the partnership.

If any one or more of the partners are subjected to loss, it results from their own negligence, but it is manifest that a Court of Chancery cannot reach any settlement in this case, which might

34—VOL. 4.

not be even more unjust than to leave the parties where they have placed themselves by their own laches.

The Chancellor's decree, dismissing the bill, will be affirmed, and the costs of this Court, and the Court below, will be paid in equal parts by the personal representatives of the four partners.